No. 58,679

BARTLETT COOPERATIVE ASSOCIATION, *Appellant*, v. RON PATTON, *Appellee*, and COFFEYVILLE STATE BANK, *Garnishee*.

(722 P.2d 551)

Opinion filed July 18, 1986.

*Morris D. Hildreth*, of Becker, Hildreth, Eastman, Gossard, Bell and Hassenplug, of Coffeyville, argued the cause and was on the briefs for appellant.

*Edward W. Dosh*, of Parsons, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

MCFARLAND, J.: Plaintiff Bartlett Cooperative Association obtained a judgment against defendant Ron Patton. In attempting to collect the judgment, plaintiff garnished defendant's Individual Retirement Account (IRA) in the Coffeyville State Bank. The district court held the IRA was exempt from garnishment under federal law. Plaintiff appeals from this determination.

The first issue is procedural in nature. Plaintiff contends defendant did not timely raise the defense of exemption. The trial court's findings of fact relative to the mechanics of the garnishment are not challenged and are as follows:

"10. On June 4, 1985, a garnishment summons was issued to the Bank.

Thereafter, on June 7, 1985, on a form supplied by the Clerk, the Bank filed an answer with the Court. The pertinent parts of the answer reflected: '$1900 IRA #653217 plus interest of approximately $25, less 180-day penalty, approximately $79.65, equals $1,845.35. Signed Ted Jones, Sr., Vice President and Cashier.'

"11. There is an unsigned and undated note attached to the Bank's garnishee answer that states 'mailed copy to attorney and defendant.' The Court knows of its own knowledge that the Coffeyville Clerks make such notations on garnishment answers to indicate that they have mailed the answer and to whom. It should be noted that June 7, 1985, was a Friday.

"12. On June 20, 1985, thirteen (13) days after the Bank's answer was filed, Patton objected to the answer of the Bank '—on the basis that said account is of such a nature that it cannot be paid over to the plaintiff at this time and, therefore, the defendant maintains that the garnishee cannot legally pay said account to the plaintiff.' "

Garnishment is governed by the provisions of Article 7 of the Kansas Code of Civil Procedure, K.S.A. 60-701 *et seq.* It is defined as "either (1) a form of or an aid to attachment, or (2) in lieu of or in aid of execution." K.S.A. 60-714.

Under K.S.A. 60-716, an order of garnishment to aid in the enforcement of a judgment may be obtained against the property of the debtor. The order of garnishment is served on the garnishee, together with two copies of the answer form for the garnishee. K.S.A. 60-717(b). Within ten days of service, the garnishee must file an answer. The answer essentially sets out what of the debtor's property the garnishee has under its control. K.S.A. 60-718(a).

The provision of the Code which is in issue in this case is K.S.A. 60-718(c), which comes into play after the garnishee's answer has been filed. That section states, in pertinent part:

"The clerk shall cause a copy of the answer to be mailed promptly to the plaintiff and the defendant. Within 10 days after the filing of the answer the plaintiff or the defendant or both of them may reply thereto controverting any statement in the answer. . . . If the garnishee answers as required herein and no reply thereto is filed, the allegations of the answer are deemed to be confessed. If a reply is filed as herein provided, the court shall try the issues joined, the burden being upon the party filing the reply to disprove the sworn statements of the answer . . . ."

The appellant contends the court erred in considering the appellee's response because it constituted a reply under K.S.A. 60-718(c) and was filed thirteen days after the garnishee's answer. The appellee counters that he did not file a "reply" because he was not denying that the garnishee had his property, rather, he was claiming that the property was exempt from

garnishment. He also argues that even if bound by the 10-day limit he had three extra days because "service" was by mail. K.S.A. 60-206(e).

K.S.A. 60-720 is titled "trial." Paragraph (c) provides as follows:

> "*Right of defendant to contest garnishment.* The *defendant may, in addition to controverting the statements in the answer of the garnishee, defend the proceedings against the garnishee, upon the ground* that the indebtedness of the garnishee, or any *property* held by him or her, *is exempt* from execution against such defendant . . . ." (Emphasis supplied.)

Nowhere does the statute set out an explicit procedure for raising this defense. However, K.S.A. 60-724 explicitly provides that "[n]o judgment shall be rendered in garnishment by reason of the garnishee['s] . . . (3) holding moneys or property exempt by law, or the proceeds therefrom."

We conclude the question of exemption was timely raised. The response of the defendant did not controvert any statement contained in the garnishee's answer. Clearly, K.S.A. 60-718(c) does not cover all issues in a garnishment proceeding. A third party claiming ownership in the garnished moneys is not controlled by the statute. The defense of exemption is designated in K.S.A. 60-720 as a defense in addition to any controverting of statements made in the garnishee's answer. The ten-day requirement in K.S.A. 60-718(c) is not applicable to the claim of exemption herein.

We turn now to the merits. Did the district court err in holding that federal law prohibits garnishment of an IRA?

Inasmuch as IRA's have been a fact of life for a number of years, it would be logical to assume this issue would involve a substantial body of case law. Such is not the situation.

In 1974, Congress reacted to the national concern over abuses affecting the stability and accountability of employee benefit plans by the passage of the Employee Retirement Income Security Act of 1974 (ERISA) (88 Stat. 832), codified as 29 U.S.C. § 1001 *et seq.* (1982). The purpose of ERISA is stated in 29 U.S.C. § 1001 (1982) as follows:

> "**Congressional findings and declaration of policy.**
> "(a) **Benefit plans as affecting interstate commerce and the Federal taxing power.** The Congress finds that the growth in size, scope, and numbers of employee benefit plans in recent years has been rapid and substantial; that the operational scope and economic impact of such plans is increasingly interstate;

that the continued well-being and security of millions of employees and their dependents are directly affected by these plans; that they are affected with a national public interest; that they have become an important factor affecting the stability of employment and the successful development of industrial relations; that they have become an important factor in commerce because of the interstate character of their activities, and of the activities of their participants, and the employers, employee organizations, and other entities by which they are established or maintained; that a large volume of the activities of such plans is carried on by means of the mails and instrumentalities of interstate commerce; that owing to the lack of employee information and adequate safeguards concerning their operation, it is desirable in the interests of employees and their beneficiaries, and to provide for the general welfare and the free flow of commerce, that disclosure be made and safeguards be provided with respect to the establishment, operation, and administration of such plans; that they substantially affect the revenues of the United States because they are afforded preferential Federal tax treatment; that despite the enormous growth in such plans many employees with long years of employment are losing anticipated retirement benefits owing to the lack of vesting provisions in such plans; that owing to the inadequacy of current minimum standards, the soundness and stability of plans with respect to adequate funds to pay promised benefits may be endangered; that owing to the termination of plans before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits; and that it is therefore desirable in the interests of employees and their beneficiaries, for the protection of the revenue of the United States, and to provide for the free flow of commerce, that minimum standards be provided assuring the equitable character of such plans and their financial soundness.

"(b) **Protection of interstate commerce and beneficiaries by requiring disclosure and reporting, setting standards of conduct, etc., for fiduciaries.** It is hereby declared to be the policy of this chapter to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

"(c) **Protection of interstate commerce, the Federal taxing power, and beneficiaries by vesting of accrued benefits, setting minimum standards of funding, requiring termination insurance.** It is hereby further declared to be the policy of this chapter to protect interstate commerce, the Federal taxing power, and the interests of participants in private pension plans and their beneficiaries by improving the equitable character and the soundness of such plans by requiring them to vest the accrued benefits of employees with significant periods of service, to meet minimum standards of funding, and by requiring plan termination insurance."

The thrust of ERISA is to protect employees' rights in employee benefit plans arising from their employment—whether controlled by employers or labor unions. In such plans, an

employee is one of a herd with no real control over his or her interest in the fund or access to information on its management. Funds paid into such plans by employers are generally not taxable to the employee at the time of contribution. This placed the working person not covered by such a plan at a distinct disadvantage if he or she sought to develop a private pension plan for his or her benefit; hence, the birth of the Individual Retirement Account (IRA) in ERISA for working persons not covered by an employee pension plan.

An IRA gives the owner one of the tax advantages of an employer funded pension fund (contributions are not taxed when placed in the account). However, the need for the safeguards set forth in 29 U.S.C. § 1001 applicable to employee benefit plans is absent. The owner of an IRA individually contracts for the IRA and retains much control over it. He or she can secure return of the invested funds prior to retirement by paying a penalty for early withdrawal and, of course, income taxes on the funds. Federal law specifically requires that tax-qualified employee pensions, profit-sharing, and stock bonus plans contain an anti-alienation clause. I.R.C. § 401(a)(13) (1982). (For convenience, further citations to federal law where applicable shall be to the Internal Revenue Code rather than ERISA.) An employee under an employee benefit plan might easily be bilked out of what, to him or her, appears to be some vague contingent future interest in the employee benefit plan—hence a need for the anti-alienation provision. Effective in 1982, the Economic Recovery Act of 1981 permitted all working people to establish IRA's, regardless of whether or not they were covered by employee benefit plans. IRA's are established under I.R.C. § 408 (1982) and *I.R.C. § 408 contains no similar anti-alienation provision.* Had Congress believed federal interest required a like provision in IRA's it could have inserted such provision. That it did not do so is significant. Appellee herein would give an IRA under I.R.C. § 408 a ride on the coattails of employee benefit plans under I.R.C. § 401 as far as anti-alienation is concerned. We do not believe that was the Congressional intent.

It is true that early withdrawal of an IRA subjects the owner to payment of a penalty—so does early withdrawal of a certificate of deposit (CD). Additionally, early withdrawal subjects the owner of the IRA to additional tax liability for the year in question. But

this does not imply any Congressional intent to prohibit garnishment of IRA's. We conclude that garnishment of IRA's is not precluded by federal law. For a more in-depth discussion of the applicable federal law see Lohwater, *Who Can Attach Your IRA*, 4 Nat'l L. J. No. 32, 22 (April 19, 1982). The Lohwater article, likewise, concludes federal law does not remove IRA's from the reach of creditors.

Appellee concedes that the garnishment herein is not contrary to Kansas law and that an exemption for the IRA must be found in federal law. Normally, we would not discuss state law under this circumstance. However, this opinion would be misleading if we did not mention certain 1986 amendments (addition of sections [b], [c], and [d]) to K.S.A. 60-2308 contained in Substitute for House Bill No. 2522 (L. 1986, ch. 220, § 1), which provides in part:

"Section 1. K.S.A. 60-2308 is hereby amended to read as follows: 60-2308. (a) Money received by any debtor as pensioner of the United States within three months next preceding the issuing of an execution, or attachment, or garnishment process, cannot be applied to the payment of the debts of such pensioner when it is made to appear by the affidavit of the debtor or otherwise that such pension money is necessary for the maintenance of the debtor's support or a family support wholly or in part by the pension money. The filing of the affidavit by the debtor, or making proof as above provided, shall be *prima facie* evidence, and it shall be the duty of the court in which such proceeding is pending to release all moneys held by such attachment or garnishment process, immediately upon the filing of such affidavit, or the making of such proof.

"(b) *Except as provided in subsection (c), any money or other assets payable to a participant or beneficiary from, or any interest of any participant or beneficiary in, a retirement plan which is qualified under sections 401(a), 403(a), 403(b), 408 or 409 of the federal internal revenue code of 1954, as amended, shall be exempt from any and all claims of creditors of the beneficiary or participant.* Any such plan shall be conclusively presumed to be a spendthrift trust under these statutes and the common law of the state. All records of the debtor concerning such plan or arrangement and of the plan concerning the debtor's participation in the plan or arrangement shall be exempt from the subpoena process.

"(c) Any plan or arrangement described in subsection (b) shall not be exempt from the claims of an alternate payee under a qualified domestic relations order. However, the interest of any and all alternate payees under a qualified domestic relations order shall be exempt from any and all claims of any creditor, other than the state department of social and rehabilitation services, of the alternate payee. As used in this subsection, the terms 'alternate payee' and 'qualified domestic relations order' have the meaning ascribed to them in section 414(p) of the federal internal revenue code of 1954, as amended.

"(d) *The provisions of subsections (b) and (c) shall apply to any proceeding*

*which: (1) Is filed on or after July 1, 1986; or (2) was filed on or after January 1, 1986, and is pending or on appeal July 1, 1986."* (Emphasis supplied.)

Inasmuch as the garnishment herein was filed prior to the time periods contained in section (d), these amendments do not apply to the case before us. However, it should be noted section (b) does exempt, *inter alia*, an I.R.C. § 408 retirement plan which is an IRA.

We conclude the district court erred in concluding the IRA herein was exempt from garnishment under federal law.

The judgment is affirmed in part, reversed in part, and remanded for further proceedings.